# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **P.M.**, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>  V.<br><br>**NOVARTIS PHARMACEUTICALS CORPORATION**,<br><br>    Defendant. | Case No. 2:26-cv-2917<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff P.M., individually and on behalf of all similarly situated persons, alleges the following against Defendant Novartis Pharmaceuticals Corporation ("Novartis" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

## I.    INTRODUCTION

1.    Information concerning an individual's health is among the most sensitive, and closely guarded information in our society.

2.    The unwanted disclosure of such information can be enormously harmful. It can result in discrimination in the workplace, and denial of insurance coverage. And, if people are unable to trust that their sensitive health information will be kept confidential, they are much less likely to seek medical care when they need it most.

1

3.      Novartis is one of the largest healthcare companies in the world. Novartis employs 77,000 employees and sells its products in 118 countries.[1] Through its many pharmaceutical products, Novartis serves over 304 million patients worldwide.[2]

4.      The manufacture and sale of pharmaceuticals is a key component of Novartis's business, generating over $50 billion in sales for Novartis in 2025.[3] As part of its pharmaceutical business, Novartis maintains consumer-directed marketing websites for their various pharmaceutical products, including medication prescribed to Plaintiff:

| **Brand Name** | **Pharmaceutical** | **Website** |
|---|---|---|
| Cosentyx | secukinumab | www.cosentyxhcp.com (the "Cosentyx Website") |
| Entresto | sacubitril/valsartan | www.entresto.com/ (the "Entresto Website") |
| Illaris | canakinumab | www.ilaris.com (the "Ilaris Website") |
| Kisqali | ribociclib | us.kisqali.com/ (the "Kisqali Website") |
| Leqvio | inclisiran | www.leqvio.com (the "Leqvio Website") |
| Tafinlar + Mekinist | dabrafenib and trametinib | us.tafinlarmekinist.com (the "Tafinlar + Mekinist Website") |
| Pluvicto | lutetium Lu 177 vipivotide tetraxetan | us.pluvicto.com (the "Pluvicto Website") |
| Xolair | omalizumab | www.xolair.com (the "Xolair Website") |

---

[1] *About*, NOVARTIS, https://www.novartis.com/about (last accessed Mar. 16, 2026).
[2] *Id*.
[3] *Novartis delivered high single-digit sales growth, achieved 40% core margin and further advanced the pipeline in 2025*, NOVARTIS (February 4, 2026), *available online at*: https://www.novartis.com/news/media-releases/novartis-delivered-high-single-digit-sales-growth-achieved-40-core-margin-and-further-advanced-pipeline-2025 (last accessed Mar. 28, 2025).

Hereinafter, these consumer-directed pharmaceutical marketing websites are referred to collectively as the "Pharmaceutical Websites."

5.      Through the Pharmaceutical Websites, patients can obtain information about Defendant's pharmaceutical products, apply for and receive vouchers for discounts on Defendant's pharmaceuticals ("Saving Cards"), and obtain access to various support programs.[4] Patients are also offered access to the Novartis Patient Support team, prescription cost support programs, and various medical informational resources offered through the Pharmaceutical Websites.[5] Plaintiff used a Pharmaceutical Website for some or all of these purposes, as described more fully below.

6.      Unfortunately, unbeknownst to Plaintiff and other visitors to the Pharmaceutical Websites, Defendant does not keep its patients' private personal and health information confidential. Instead, through the Pharmaceutical Websites, Defendant collected and transmitted personally identifiable and sensitive health information pertaining to Plaintiff's medical conditions, prescriptions, and medical expenses (collectively, the "Sensitive Health Information") to unauthorized third parties, including Alphabet, Inc. ("Google") and Contentsquare (together with Google, the "Tracking Tool Providers"), through the use of surreptitious online tracking tools without Plaintiff's or Class Members' consent.

7.      Online advertising giants like the Tracking Tool Providers compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured by those online behemoths can be used to stream ads to that person. If, for example, the Tracking Tool Providers receive information that a person is suffering from arthritis, they can use that information, and allow their clients to use that information, to

---

[4] *See* Pharmaceutical Websites, at ¶ 4, *supra*.
[5] *Id*.

3

deliver ads to that person's computers and smartphones for products and services related to arthritic pain management.

8.    The Tracking Tool Providers offer website operators access to their proprietary suites of marketing, advertising, and customer analytics services, including Google's *Google Analytics*, *Google AdSense*, and *Google Tag Manager* products; and Contentsquare's analytics platform (collectively, the "Business Tools"). By using any of the Tracking Tool Providers' Business Tools, website operators can leverage the Tracking Tool Providers' enormous databases of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments to exploit.

9.    The Tracking Tool Providers' massive databases of consumer information can only exist with the help of users of the Business Tools, like Defendant. To use any one of the Tracking Tool Providers' Business Tools, a website operator must install the Tracking Tool Providers' internet user surveillance software onto their website, including tracking pixels ("Pixels") and cookies (collectively, the "Tracking Tools"). In other words, if a website operator wishes to use, e.g., Google Analytics, it must install Google's Tracking Tools onto its website. After being installed, the Tracking Tools capture detailed information about every visitor to the website, which may include the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer. Moreover, this sensitive information often includes a unique identifier that the Tracking Tool Providers use to identify that user, regardless of what computer or phone is used to access the website.

10.    In essence, when website operators use the Tracking Tool Providers' Business Tools, they choose to participate in the Tracking Tool Providers' mass surveillance network and,

in turn, benefit from the Tracking Tool Providers' collection of user data at the expense of their customers' privacy.

11.     Defendant is a company that chose to prioritize their marketing efforts and profits over their patients' privacy by installing the Tracking Tools on their websites. The Plaintiff and Class Members used a Pharmaceutical Website and had their personal Sensitive Health Information tracked by Defendant using the Tracking Tools. However, Defendant *never* obtained authorization from Plaintiff or Class Members to share their Sensitive Health Information with third parties. Therefore, at all relevant times, Plaintiff and Class Members could not, and did not, provide informed consent for their Sensitive Health Information to be transmitted to the third parties, including to the largest advertisers and compilers of personal information in the world.

12.     Numerous commentators have raised alarm at these practices. A full decade ago, in 2015, Politico published a report exposing how drug companies like Defendant collect consumer medical data through price discount programs without their knowledge, sometimes even collecting the entirety of a patient's medical records.[6] As scrutiny of such practices increased, the FTC took action in a similar case against GoodRX Holdings, Inc. due to its practice of collecting medical data on-line from customers of its prescription drug discount program.[7] Yet, despite over a decade of public outcry, Defendant continues to collect and disclose the Sensitive Health Information of users of the Pharmaceutical Websites to unauthorized third parties.

/

---

[6] *See* Darius Tahir, *Big Pharma gets data for discounts*, POLITICO (Dec. 22, 2015), https://www.politico.com/story/2015/12/drug-companies-data-for-discounts-217080 (last accessed Oct. 23, 2025).
[7] *See FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising*, FEDERAL TRADE COMMISSION (Feb 1, 2024), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising (last accessed Oct. 23, 2025).

13. Health information is highly regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[8] Accordingly, Defendant's disclosure of Plaintiff's and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

14. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

15. Therefore, Plaintiff seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: Invasion of Privacy; Breach of Confidence; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; and violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*.

/

/

/

---

[8] 18 U.S.C. § 1320d-(6).

## II.    PARTIES

*Plaintiff P.M.*

16.    Plaintiff P.M. is a citizen of the State of Vermont, residing in Franklin County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

17.    Plaintiff P.M. suffers from breast cancer. To treat this condition, Plaintiff P.M.'s physician prescribed Kisqali, a medication produced, marketed, and sold by Defendant.

18.    In or around November of 2024, Plaintiff P.M. visited the Kisqali Website to obtain information regarding Kisqali and to apply for a Savings Card.

19.    Unbeknownst to Plaintiff P.M., the Kisqali Website transmitted her Sensitive Health Information—including the fact that she enrolled in the Kisqali savings program and her specific medical condition—to unauthorized third parties through the Tracking Tools.

20.    Plaintiff P.M. never authorized Defendant to disclose any aspect of her communications with Defendant through the Kisqali Website to third parties, including the Sensitive Health Information that she provided through the Kisqali Website.

21.    On every occasion that she visited the Kisqali Website, Plaintiff P.M. possessed an account with Google, and she accessed the Kisqali Website while logged into her Google account on the same device.

22.    After providing her Sensitive Health Information to Defendant through the Kisqali Website, Plaintiff P.M. began to see targeted online advertisements for products and services related to her medical condition.

*Defendant Novartis*

23.    Novartis Pharmaceuticals Corporation is a for-profit corporation incorporated in the State of New Jersey, with its principal place of business located at 1 Health Plaza, East Hanover, New Jersey, in Morris County.

7

## III.    JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than Defendant. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

25.    This Court has personal jurisdiction over Defendant because it is headquartered in this judicial district, and have otherwise made or established contacts in the State of New Jersey and in this judicial district sufficient to permit the exercise of personal jurisdiction.

26.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

8

## IV.    FACTUAL ALLEGATIONS

### A.  DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### i.    The Tracking Tool Providers Mass Advertising Surveillance Operations

27.    Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[9] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[10]

28.    Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[11] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[12]

29.    Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[13]

---

[9] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Oct. 23, 2025).

[10] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Oct. 23, 2025).

[11] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Oct. 23, 2025).

[12] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Oct. 23, 2025).

[13] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last accessed Oct. 23, 2025).

30.     Google also admits that it uses the information collected from third party websites, such as Defendant's, to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[14]

31.     Contentsquare is an analytics company that provides tools to website operators to better analyze their visitors and/or customers. Contentsquare markets its tool as a "digital analytic platform that helps web-based businesses better understand their users. It includes tools like zone-based heatmaps, journey analysis, and session replay to give a complete view of user experiences and perspectives."[15]

32.     While the Tracking Tool Providers admit that they collect information from third-party websites through the Tracking Tools, neither provides, nor could provide, a publicly available list of every webpage on which their Tracking Tools are installed. As such, the vague descriptions of the Tracking Tool Providers' data collection practices referenced above could not have given Plaintiff and Class Members any reason to think that Defendant was part of the Tracking Tool Providers' surveillance networks. Moreover, as Defendant does not disclose its use of the Tracking Tools, Plaintiff and Class Members could not have been reasonably expected to review any of the Tracking Tool Providers privacy statements in connection with their use of the Pharmaceutical Websites

33.     The Tracking Tool Providers aggregate the user information that they collect from third-party websites into 'advertising profiles' consisting of all of the data that they have collected

---

[14] *Id.*
[15] *Experience Analytics*, CONTENTSQUARE, https://contentsquare.com/platform/experience-analytics/ (last accessed Mar. 18, 2026).

about a given user.[16] With these advertising profiles, the Tracking Tool Providers can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[17]

34.    The surveillance of individual's internet usage through Tracking Tools is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google[, and] Facebook[.]"[18] Google trackers are present on 74-percent of all web traffic, and 16-percent of websites have a hidden Facebook tracking Pixel.[19]

35.    Moreover, as in this case, the data collected through the Tracking Tools often pertains to the most personal and sensitive aspects of an individual's life. For example:

    a.  93-percent of pornography websites allow third parties, including Google and Facebook, to collect their user's browsing habits.[20] In fact, Google advertising trackers were found on 73-percent of pornography websites.[21]

---

[16] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[17] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics ((last accessed Oct. 23, 2025); *Facebook Ads: Who You Can Target*, SEOM Interactive, https://searchenginesmarketer.com/company/resources/facebook-ads-can-target/ ((last accessed Oct. 23, 2025); *About Ad Targeting in TikTok Ads Manager*, TIKTOK, https://ads.tiktok.com/help/article/ad-targeting?lang=en (last accessed Oct. 23, 2025).

[18] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Oct. 23, 2025).

[19] *WhoTracksMe*, Ghostery, https://www.ghostery.com/whotracksme/ (last accessed Oct. 23, 2025).

[20] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[21] *Id.*

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[22]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[23] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google and Facebook.[24]

d. Thirty-three of the most popular crisis center websites provide information to Facebook through its Meta Pixel, including, in some cases, that users filled out a contact form or clicked a button to initiate a call to a suicide helpline.[25]

36.     This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[26] Likewise, in 2008, Facebook CEO Mark Zuckerberg predicted that the amount of information shared by individuals online will likely double every year, and Facebook's best strategy is to be "pushing that forward."[27]

---

[22] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[23] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Oct. 23, 2025).

[24] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Oct. 23, 2025).

[25] Colin Lechner & Jon Keegan, *Suicide Hotlines Promise Anonymity. Dozens of Their Websites Send Sensitive Data to Facebook*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/13/suicide-hotlines-promise-anonymity-dozens-of-their-websites-send-sensitive-data-to-facebook (last accessed Oct. 23, 2025).

[26] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Oct. 23, 2025).

[27] Michael Zimmer, *Mark Zuckerberg's Theory of Privacy,* THE WASHINGTON POST (Feb. 4, 2014), https://www.washingtonpost.com/lifestyle/style/mark-zuckerbergs-theory-of-privacy/2014/02/03/2c1d780a-8cea-11e3-95dd-36ff657a4dae_story.html (last accessed Oct. 23, 2025).

37.    In fact, the Tracking Tool Providers value user information so highly that they provide their Business Tools to many website operators for free, all to expand their surveillance apparatus.[28]

38.    When website operators, like Defendant, make use of the Tracking Tool Providers' Business Tools, they are essentially choosing to participate in the Tracking Tool Providers' mass surveillance network, and in return they benefit from the Tracking Tool Providers' collection of user data, at the expense of their website users' privacy. For example, in exchange for allowing it to collect user information, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[29]

39.    In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[30] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[31]

40.    Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically

---

[28] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last accessed Oct. 23, 2025) ("Google Analytics gives you the tools, free of charge").

[29]    *Google    Marketing    Platform    –    Features*,    GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Oct. 23, 2025); *see also Experience Analytics*, CONTENTSQUARE, https://contentsquare.com/platform/experience-analytics/ (last accessed Mar. 20, 2026) (Contentsquare's platform similarly allows website operators to "[q]uickly understand everything your users are doing—and why.").

[30] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[31] *Id*.

impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[32]

### ii.    Pixels Can Record Almost Every Interaction Between a User and a Website

41.    In order to use the Tracking Tool Providers' Business Tools, Defendant installed the Tracking Tools, including tracking Pixels, onto the Pharmaceutical Websites.

42.    Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[33]

43.    Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the specific buttons and hyperlinks that the user clicks, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[34]

---

[32] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POL. FOR THE INFO. SOC. (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[33] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Oct. 23, 2025).

[34] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting ((last accessed Oct. 23, 2025); Tom Kemp, *"Oops! I Did It Again" ... Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Oct. 23, 2025).

44.     But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[35]

### iii.    The Pixels Installed on the Pharmaceutical Websites Transmit Personally Identifiable Information to the Tracking Tool Providers.

45.     Every website is hosted by a computer "server" that holds the website's contents.

46.     To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.  Each "client device" (such as a computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

47.     Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

/

/

---

[35] *Lurking Beneath the Surface, supra* note 36.

48.     Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[36] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[37] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[38]

49.     When a Tracking Tool Provider accountholder logs onto their account, their web browser records a tracking cookie.[39] These cookies include a specific line of code that links the web browser to the user's account with the Tracking Tool Provider.[40]

50.     The Tracking Tool Providers' Pixels use cookies, but operate differently than cookies. Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user. The information can include details about the user, his or her interactions with the website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device).

51.     Simultaneously, the Pixels, like those installed on the Pharmaceutical Websites, request identifying information from any of the Tracking Tool Provider' cookies previously installed on the user's web browser.

52.     The Pixel then combines the data it received from the browser with the data it acquired from the cookie, and instructs the web browser to transmit the information back to the

---

[36] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last accessed Oct. 23, 2025).
[37] *Id*.
[38] *Id*.
[39] Cyphers, *supra* note 16.
[40] *Id*.

16

Tracking Tool Providers. As a result, the Tracking Tool Providers can link all of the user information collected by their Pixels on the Pharmaceutical Websites to the user's identity, via the user's account or profile. Thus, even if a user never actually logs into a website, or fills out a form, the website, along with the Tracking Tool Providers, can know the user's identity.

53.    A remarkable number of Americans possess a Google account. One-third of Americans have accounts with Google's Gmail e-mail client, and over 80-percent of Americans use YouTube, Google's video client.[41] When these users visit a website, like the Pharmaceutical Websites, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

54.    However, it is not only Google accountholders that are at risk of having Pixel-collected website data linked to their identities. Rather, the Tracking Tool Providers utilize sophisticated data tracking methods to identify even those few users who do not have a account.

55.    The Tracking Tools, like those on the Pharmaceutical Websites, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

56.    An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[42] By tracking this browser fingerprint, the Tracking Tool Providers are able to compile a user's activity across the internet.[43]

---

[41] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ((last accessed Oct. 23, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Oct. 23, 2025); Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use/ (last visited Oct. 23, 2025).
[42] Cyphers, *supra* note 16.
[43] *Id*.

And, as the Tracking Tool Providers continuously compile user data over time, their understanding of the user's browser fingerprint becomes more sophisticated such that they need only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

### iv. Defendant Disclosed Plaintiff's and Class Members' Sensitive Health Information to Unauthorized Third Parties.

57. To download pharmaceutical Savings Cards and receive information about their prescribed drugs, Plaintiff and Class Members were required to use the Pharmaceutical Websites.

58. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Pharmaceutical Websites to capture and transmit the Sensitive Health Information that they communicated to Defendant while accessing medical information and applying for or accessing prescription Saving Cards to unauthorized third parties, including the Tracking Tool Providers. The information provided in the following Figures is exemplar information collected on the Pharmaceutical Websites, and is not Plaintiff's information, but the Tracking Tools installed on the Pharmaceutical Websites collected the same or similar information about Plaintiff and Class Members.

*Kisqali Website*

59. The following screenshots ("Figures 1-4") depict network transmissions made to Google by the Tracking Tools installed on the Kisqali Website. As Figures 1-4 show, when patients register for a Savings Card through the Kisqali Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Kisqali Website includes the fact that the patient is prescribed Kisqali, the fact that the patient enrolled in

18

the Kisqali patient savings program, whether the patient is completing the form for themselves or someone else, and the patient's specific cancer diagnosis.

| | |
|---|---|
| v | 2 |
| tid | G-GWD7L2JTCL |
| gtm | 45je5990v886277008z89105727373za200zb9105727373zd9105727373 |
| _p | 1757529475282 |
| _gaz | 1 |
| gcs | G111 |
| gcd | 13v3v3v3v5l1 |
| npa | 0 |
| dma | 0 |
| cid | 1400388102.1757529487 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;140.0.7339.81|Not%3DA%3FBrand;24.0.0.0|Microsoft%20Edge;140.0.3485.54 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _s | 1 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528501~104684208~104684211~104948813~105367987~105367989~ |
| sid | 1757529487 |
| sct | 1 |
| seg | 0 |
| dl | https://us.kisqali.com/early-breast-cancer |
| dr | https://us.kisqali.com/ |
| dt | Early Breast Cancer Treatment (eBC) | KISQALI® (ribociclib) |
| _tu | KA |
| en | nav_click |
| _fv | 1 |
| _nsi | 1 |
| _ss | 1 |
| ep.clicked_element | novartis patient support |
| ep.link_text | novartis patient support |
| ep.content_type | |
| tfd | 12774 |

| | |
|---|---|
| v | 2 |
| tid | G-8N8DJC3PC4 |
| gtm | 45je63d1h1v9172448178z89172426367za20gzb9172426367zd9172426367 |
| _p | 1773768952201 |
| _gaz | 1 |
| gcd | 13I3I3I3I1I1 |
| npa | 0 |
| dma | 0 |
| cid | 1923386823.1773768958 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3AA-Brand;99.0.0.0|Microsoft%20Edge;145.0.3800.97|Chromium;145.0.7632.160 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAGQ |
| _s | 4 |
| tag_exp | 103116026~103200004~115938466~115938469~116024733~117484252 |
| sid | 1773768958 |
| sct | 1 |
| seg | 1 |
| dl | https://support.kisqali.com/enrollment/wizard/performer/1/ |
| dr | https://support.kisqali.com/ |
| dt | Sign Up for Novartis Patient Support | KISQALI® (ribociclib) |
| en | Sign Up |
| ep.event_action | Enroll Person |
| ep.event_label | Myself |
| ep.timestamp | 2026-03-17T10:37:03.340-07:00 |
| ep.profile_form_phone_number_type | (not set) |
| ep.enrollment_api_status | (not set) |
| ep.enroll_person | Myself |
| ep.caregiver_consent | (not set) |
| ep.own_age | (not set) |
| ep.patient_age | (not set) |
| ep.patient_eligibility | (not set) |
| ep.primary_condition | (not set) |
| ep.selected_status | Success |
| ep.profile_form_tcpa_consent | (not set) |
| ep.profile_form | (not set) |
| ep.review_action | (not set) |
| ep.confirmation_status | (not set) |
| ep.profile_form_best_time_to_talk | (not set) |
| ep.profile_form_email_status | (not set) |
| ep.enrollment_id | (not set) |
| ep.profile_form_free_sharps_container | (not set) |
| ep.profile_form_free_travel_bag | (not set) |
| ep.profile_form_popup_tcpa | (not set) |
| _et | 1823 |
| tfd | 72139 |

20

21

| | |
|---|---|
| v | 2 |
| tid | G-8N8DJC3PC4 |
| gtm | 45je63d1h1v9172448178z89172426367za20gzb9172426367zd9172426367 |
| _p | 1773768952201 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1923386823.1773768958 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3AA-Brand;99.0.0.0|Microsoft%20Edge;145.0.3800.97|Chromium;145.0.7632.160 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAGQ |
| _s | 42 |
| tag_exp | 103116026~103200004~115938466~115938469~116024733~117484252 |
| dl | https://support.kisqali.com/enrollment/confirmation/confirmed/print/fto/ |
| dt | Print |
| sid | 1773768958 |
| sct | 1 |
| seg | 1 |
| dr | https://support.kisqali.com/enrollment/confirmation/loading/ |
| en | page_view |
| ep.timestamp | 2026-03-17T10:41:16.444-07:00 |
| ep.profile_form_phone_number_type | (not set) |
| ep.enroll_person | Myself |
| ep.caregiver_consent | (not set) |
| ep.own_age | 18 years or older |
| ep.patient_age | (not set) |
| ep.patient_eligibility | fto,adherence |
| ep.primary_condition | HR+/HER2- metastatic breast cancer |
| ep.selected_status | Success |
| ep.profile_form_tcpa_consent | Yes |
| ep.profile_form | Success |
| ep.review_action | Sign Up |
| ep.confirmation_status | success |
| ep.prescription_insurance | no |
| ep.profile_form_best_time_to_talk | (not set) |
| ep.profile_form_email_status | Filled |
| ep.event_action | Print |
| ep.event_label | https://support.kisqali.com/enrollment/confirmation/confirmed/print/fto/ |
| ep.enrollment_status | Completed |
| ep.profile_form_free_sharps_container | (not set) |
| ep.profile_form_free_travel_bag | (not set) |
| _et | 40 |
| tfd | 326219 |



| | |
|---|---|
| v | 2 |
| tid | G-8N8DJC3PC4 |
| gtm | 45je63d1h1v9172448178z89172426367za20gzb9172426367zd9172426367 |
| _p | 1773768952201 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1923386823.1773768958 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%3AA-Brand;99.0.0.0|Microsoft%20Edge;145.0.3800.97|Chromium;145.0.7632.160 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAGQ |
| _s | 38 |
| tag_exp | 103116026~103200004~115938466~115938469~116024733~117484252 |
| sid | 1773768958 |
| sct | 1 |
| seg | 1 |
| dl | https://support.kisqali.com/enrollment/confirmation/loading/ |
| dr | https://support.kisqali.com/enrollment/forms/review/ |
| dt | Sign Up for Novartis Patient Support | KISQALI® (ribociclib) |
| en | Confirmation |
| _c | 1 |
| ep.event_action | Result |
| ep.event_label | success |
| ep.timestamp | 2026-03-17T10:40:51.16-07:00 |
| ep.profile_form_phone_number_type | (not set) |
| ep.enrollment_api_status | Complete |
| ep.enroll_person | Myself |
| ep.caregiver_consent | (not set) |
| ep.own_age | 18 years or older |
| ep.patient_age | (not set) |
| ep.patient_eligibility | fto,adherence |
| ep.primary_condition | HR+/HER2- metastatic breast cancer |
| ep.selected_status | Success |
| ep.profile_form_tcpa_consent | Yes |
| ep.profile_form | Success |
| ep.review_action | Sign Up |
| ep.confirmation_status | success |
| ep.prescription_insurance | no |
| epn.enrollment_local_time | 10 |
| ep.profile_form_best_time_to_talk | (not set) |
| ep.profile_form_email_status | Filled |
| ep.enrollment_id | 3883ee79-6b53-403f-874b-9e9724ef92dc |
| ep.profile_form_free_sharps_container | (not set) |
| ep.profile_form_free_travel_bag | (not set) |
| ep.profile_form_popup_tcpa | (not set) |
| _et | 3201 |
| tfd | 299815 |

*Figures 1-4. Exemplar screenshots depicting network traffic from the Kisqali Website which shows information transmitted to Google when patients request a Savings Card.*

22

60.     The following screenshot ("Figure 5") depicts network transmissions made to Contentsquare by the Tracking Tools installed on the Kisqali Website. The list of parenthetical number coordinates encode detailed telemetric data record by the Tracking Tools showing, *inter alia*, where the user moved their mouse, how far they scrolled, and the areas of the webpage that the user spent the most time reviewing.

Request Payload        View source
▼ [{type: 3, date: 1773769393266,…}, {type: 3, date: 1773769393266, args: [14523, null, "class",…]},…]
  ▶ 0: {type: 3, date: 1773769393266,…}
  ▶ 1: {type: 3, date: 1773769393266, args: [14523, null, "class",…]}
  ▶ 2: {type: 48, args: [1, "mouse", 742, 430.7], date: 1773769393267}
  ▶ 3: {type: 2, date: 1773769393269, args: [14515]}
  ▶ 4: {type: 2, date: 1773769393269, args: [14516]}
  ▶ 5: {type: 2, date: 1773769393269, args: [14571]}
  ▶ 6: {type: 2, date: 1773769393269, args: [14863]}
  ▶ 7: {type: 2, date: 1773769393269, args: [14514]}
  ▶ 8: {type: 2, date: 1773769393269, args: [14513]}
  ▶ 9: {type: 16, args: [13412], date: 1773769393269}
  ▶ 10: {type: 48, args: [1, "mouse", 714.7, 426.7], date: 1773769393300}
  ▶ 11: {type: 48, args: [1, "mouse", 712.7, 426.7], date: 1773769393335}
  ▶ 12: {type: 48, args: [1, "mouse", 711.3, 426], date: 1773769393503}
  ▶ 13: {type: 48, args: [1, "mouse", 702.7, 426], date: 1773769393536}
  ▶ 14: {type: 48, args: [1, "mouse", 691.3, 425.3], date: 1773769393569}
  ▶ 15: {type: 48, args: [1, "mouse", 673.3, 425.3], date: 1773769393603}
  ▶ 16: {type: 48, args: [1, "mouse", 606.7, 412.7], date: 1773769393636}
  ▶ 17: {type: 16, args: [13414], date: 1773769393660}
  ▶ 18: {type: 48, args: [1, "mouse", 514, 381.3], date: 1773769393669}
  ▶ 19: {type: 16, args: [13411], date: 1773769393687}
  ▶ 20: {type: 29, date: 1773769393721,…}
  ▶ 21: {type: 48, args: [1, "mouse", 424.7, 339.3], date: 1773769393703}
  ▶ 22: {type: 16, args: [13407], date: 1773769393729}
  ▶ 23: {type: 48, args: [1, "mouse", 364, 306], date: 1773769393736}
  ▶ 24: {type: 48, args: [1, "mouse", 350.7, 293.3], date: 1773769393770}
  ▶ 25: {type: 48, args: [1, "mouse", 350, 291.3], date: 1773769393806}
  ▶ 26: {type: 48, args: [1, "mouse", 350, 290.7], date: 1773769394086}
  ▶ 27: {type: 48, args: [1, "mouse", 315.3, 270.7], date: 1773769394120}
  ▶ 28: {type: 16, args: [13403], date: 1773769394128}
  ▶ 29: {type: 48, args: [1, "mouse", 262.7, 242.7], date: 1773769394152}
  ▶ 30: {type: 48, args: [1, "mouse", 212, 207.3], date: 1773769394185}
  ▶ 31: {type: 48, args: [1, "mouse", 160.7, 154], date: 1773769394218}
  ▶ 32: {type: 48, args: [1, "mouse", 126, 106.7], date: 1773769394251}
  ▶ 33: {type: 16, args: [13366], date: 1773769394277}
  ▶ 34: {type: 16, args: [13360], date: 1773769394254}
  ▶ 35: {type: 48, args: [1, "mouse", 112, 83.3], date: 1773769394286}
  ▶ 36: {type: 48, args: [1, "mouse", 97.3, 64], date: 1773769394319}
  ▶ 37: {type: 48, args: [1, "mouse", 93.3, 60], date: 1773769394352}
  ▶ 38: {type: 48, args: [1, "mouse", 92.7, 59.3], date: 1773769394385}
  ▶ 39: {type: 48, args: [1, "mouse", 90.7, 59.3], date: 1773769394419}
  ▶ 40: {type: 48, args: [1, "mouse", 84.7, 58], date: 1773769394452}
  ▶ 41: {type: 48, args: [1, "mouse", 70.7, 49.3], date: 1773769394485}
  ▶ 42: {type: 48, args: [1, "mouse", 60, 41.3], date: 1773769394518}
  ▶ 43: {type: 48, args: [1, "mouse", 49.3, 24.7], date: 1773769394551}
  ▶ 44: {type: 16, args: [13360], date: 1773769394557}
  ▶ 45: {type: 48, args: [1, "mouse", 44, 0], date: 1773769394584}
  ▶ 46: {type: 29, date: 1773769395357, args: [{,…}]}
  ▶ 47: {date: 1773769395743, type: 72, args: ["pending-events", 0]}

*Figures 5. Exemplar screenshot depicting network traffic from the Kisqali Website which shows information transmitted to Contentsquare when patients enroll in the savings program.*

61.     Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff and Class

Members to their identities. The screenshots show that the Google Tracking Tools on the Kisqali Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's region and language.

*Cosentyx Website*

62.     The following screenshots ("Figures 6-7") depict network transmissions made to Google by the Tracking Tools installed on the Cosentyx Website. As Figures 6-7 show, when patients request and download a Savings Card through the Cosentyx Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Cosentyx Website includes the fact that the patient is prescribed Cosentyx, the fact that the patient downloaded a Cosentyx Savings Card, and the patient's specific medical condition.

/

/

/

/

/

/

/

/

/

/

/

/

24

| | |
|---|---|
| v | 2 |
| tid | G-1MS2HWYZGW |
| gtm | 45je5990h1v895798098z89115657491za200zb9115657491zd9115657491 |
| _p | 1757527996115 |
| _gaz | 1 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 838393391.1757527925 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;140.0.7339.81|Not%3DA%3FBrand;24.0.0.0|Microsoft%20Edge;140.0.3485.54 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 7 |
| tag_exp | 101509157~103116026~103200004~103233427~104527907~104528501~104684208~104684211~104948813~105367987~105367989~105426769~105426771~115497442 |
| sid | 1757527999 |
| sct | 1 |
| seg | 1 |
| dl | https://connect.cosentyx.com/enrollment/wizard/savings/1/ |
| dt | Sign Up for COSENTYX® Connect | COSENTYX® (secukinumab) |
| en | Sign Up |
| ep.event_action | Patient Eligibility |
| ep.event_label | Next |
| ep.timestamp | 2025-09-10T11:14:29.374-07:00 |
| ep.profile_form_phone_number_type | (not set) |
| ep.enrollment_api_status | (not set) |
| ep.enroll_person | Myself |
| ep.caregiver_consent | (not set) |
| ep.own_age | 18 years or older |
| ep.patient_age | (not set) |
| ep.patient_eligibility | adherence |
| ep.primary_condition | Moderate to severe plaque psoriasis |
| ep.selected_status | Success |
| ep.profile_form_tcpa_consent | (not set) |
| ep.profile_form | (not set) |
| ep.review_action | (not set) |
| ep.confirmation_status | (not set) |
| ep.prescription_insurance | government |



*Figures 6-7. Exemplar screenshots depicting network traffic from the Cosentyx Website which shows information transmitted to Google when patients request a Savings Card.*

63.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. The screenshots show that the Tracking Tools on the Cosentyx Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google

26

account, as well as information commonly used to make a browser fingerprint, including the user's device information and language.

***Entresto Website***

64.    The following screenshot ("Figure 8") depicts network transmissions made to Google by the Tracking Tools installed on the Entresto Website. As Figure 8 shows, when patients request a Savings Card through the Entresto Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Entresto Website includes the fact that the patient is prescribed Entresto and the fact that the patient downloaded an Entresto Savings Card.

/

/

/

/

/

/

/

/

/

/

/

/

27



| v | 2 |
|---|---|
| tid | G-DJ5GDJHWDV |
| gtm | 45je5990v895523709z89115654641za200zb9115654641zd9115654641 |
| _p | 1757528398728 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1146019565.1757528319 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;140.0.7339.81\|Not%3DA%3FBrand;24.0.0.0\|Microsoft%20Edge;140.0.3485.54 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 11 |
| tag_exp | 101509157~103116026~103200004~103233427~104527907~104528500~104684208~104684211~104948813~105367987~105367989~105426769~105426771 |
| sid | 1757528391 |
| sct | 1 |
| seg | 1 |
| dl | https://enrollsupport.entresto.com/enrollment/wizard/ineligible/ |
| dr | https://www.entresto.com/ |
| dt | Sign Up for ENTRESTO® Savings \| ENTRESTO® (sacubitril/valsartan) |
| en | Ineligible |
| _c | 1 |
| ep.experiment_id | (not set) |
| ep.experiment_variant | (not set) |
| ep.event_action | Start Over |
| ep.event_label | Click |
| ep.timestamp | 2025-09-10T11:21:19.37-07:00 |
| ep.profile_form_phone_number_type | (not set) |
| ep.enrollment_api_status | (not set) |
| ep.sign_up_person | Myself |
| ep.patient_consent | (not set) |
| ep.own_age | 18 years or older |
| ep.patient_age | (not set) |
| ep.patient_interest | copay |
| ep.co_pay_card_terms_confirmation | (not set) |
| ep.card_activation_type | (not set) |
| ep.profile_form_adherence_checked | (not set) |
| ep.profile_form | (not set) |

*Figure 8. Exemplar screenshot depicting network traffic from the Entresto Website which shows information transmitted to Google when patients request a Savings Card.*

65.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. The screenshot shows that the Google Tracking Tools on the Entresto Website

28

transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's device information and language.

*Leqvio Website*

66.    The following screenshots ("Figures 9-10") depict network transmissions made to Google by the Tracking Tools installed on the Leqvio Website. As Figures 9-10 show, when patients view information about Leqvio and apply for a Leqvio Savings Card on the Leqvio Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Leqvio Website includes the fact that the patient is prescribed Leqvio and the fact that the patient requested a Leqvio Savings Card.

/

/

/

/

/

/

/

/

/

/

/

29

| | |
|---|---|
| v | 2 |
| tid | G-YMVQ6HLSPV |
| gtm | 45je5990v9166453781z89100820468za200zb9100820468zd9100820468 |
| _p | 1757529931843 |
| gcs | G111 |
| gcd | 13v3v3v3v5l1 |
| npa | 0 |
| dma | 0 |
| tt | |
| cid | 798652863.1757529792 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;140.0.7339.81|Not%3DA%3FBrand;24.0.0.0|Microsoft%20Edge;140.0.3485.54 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | IAAAAAQ |
| _s | 2 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~105367987~105367989~105426769~105426771 |
| sid | 1757529790 |
| sct | 1 |
| seg | 1 |
| dl | https://www.leqvio.com/savings-and-support/leqvio-care-program |
| dr | https://www.leqvio.com/ |
| dt | Care Program | LEQVIO® (inclisiran) |
| _tu | KA |
| en | add_to_cart |
| pr1 | id1249798341~nmleqvio:dtc:branded::leqvio-care-program:leqvio-care-program~caadd_to_cart~pr1~qt1 |
| ep.page_name | leqvio:dtc:branded::leqvio-care-program:leqvio-care-program |
| ep.indication | |
| ep.brand | leqvio |
| ep.patient_hcp | dtc |
| ep.site_category | branded |
| ep.environment | production |
| ep.page_url | www.leqvio.com/savings-and-support/leqvio-care-program |
| ep.map_id | 4/25    fa-11393245 |
| ep.status | 200 |
| _et | 2 |
| tfd | 5133 |



2
G-ET0GX78QFX
45je5990v9100839609z89100820468za200zb9100820468zd9100820468
1757529787633
G101
13u3v3u3u5l1
1
-
0
dYWJhMj

798652863.1757529792
en-us
2560x1440
x86
64
Chromium;140.0.7339.81|Not%3DA%3FBrand;24.0.0.0|Microsoft%20Edge;140.0.3485.54
0

Windows
19.0.0
0
1
0
denied
AAAAAAQ
5
101509157~103116026~103200004~103233427~104527907~104528500~104684208~104684211~104948813~105330666~105367987~105367989~105426769~105426771
1757529790
1
0
https://www.leqvio.com/
Cholesterol-Lowering Injection | LEQVIO® (inclisiran)
header_click
leqvio:dtc:branded:home
ldl-c
leqvio
dtc
branded
production
www.leqvio.com/
5/25    fa-11393206
200
home

5/25    FA-11393206
Patients
switch

*Figures 9-10. Exemplar screenshots depicting network traffic from the Leqvio Website which shows information transmitted to Google when patients request a Savings Card and access medical information.*

67.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. The screenshots show that the Google Tracking Tools on the Leqvio Website transmitted

31

the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, as well as information commonly used to make a browser fingerprint, including the user's device information and language.

***Pluvicto Website***

68.    The following screenshot ("Figure 11") depicts network transmissions made to Google by the Tracking Tools installed on the Pluvicto Website. As Figure 11 shows, when patients apply for a Pluvcito Savings Card, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Pluvicto Website includes the fact that the patient is prescribed Pluvicto and the fact that the patient requested a Savings Card.

/

/

/

/

/

/

/

/

/

/

/

/

32



| | |
|---|---|
| v | 2 |
| tid | G-ZZ95MFZD1W |
| gtm | 45je5990v885390184z89122898288za200zb9122898288zd9122898288 |
| _p | 1757533007546 |
| gcs | G111 |
| gcd | 13n3n3n3n5l1 |
| npa | 0 |
| dma | 0 |
| tt | |
| cid | 740184759.1757530609 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;140.0.7339.81\|Not%3DA%3FBrand;24.0.0.0\|Microsoft%20Edge;140.0.3485.54 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 4 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~105367987~105367989~105426769~105426771 |
| sid | 1757533006 |
| sct | 2 |
| seg | 1 |
| dl | https://us.pluvicto.com/novartis-patient-support |
| dr | https://us.pluvicto.com/ |
| dt | Novartis Patient Support \| PLUVICTO |
| _tu | KA |
| en | cls |
| ep.page_name | pluvicto:dtc:branded:novartis-patient-support |
| ep.indication | PSMA mCRPC |
| ep.brand | pluvicto |
| ep.patient_hcp | dtc |
| ep.site_category | branded |
| ep.environment | production |
| ep.page_url | us.pluvicto.com/novartis-patient-support |
| ep.ml_id | 3/25    fa-11337487 |
| ep.status_code | 200 |
| ep.section | novartis-patient-support |
| ep.subsection | |
| ep.web_vitals_measurement_name | cls |
| ep.web_vitals_measurement_id | v5-1757533007814-2473546626259 |
| epn.web_vitals_measurement_value | 0.9187601286372237 |

*Figures 11. Exemplar screenshots depicting network traffic from the Pluvicto Website which shows information transmitted to Google when patients request a Savings Card.*

69.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. The screenshot shows that the Google Tracking Tools on the Pluvicto Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the

user's Google account as well as information commonly used to make a browser fingerprint, including the user's device information and language.

*Tafinlar + Mekinist Website*

70.    The following screenshot ("Figure 12") depicts network transmissions made to Google by the Tracking Tools installed on the Tafinlar + Mekinist Website. As Figure 12 shows, when patients request a Savings Card through the Tafinlar + Mekinist Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Tafinlar + Mekinist Website includes the fact that the patient is prescribed Tafinlar + Mekinist and the fact that the patient requested a Tafinlar + Mekinist Savings Card.

/

/

/

/

/

/

/

/

/

/

/

34



*Figure 12. Exemplar screenshot depicting network traffic from the Tafinlar + Mekinist Website which shows information transmitted to Google when patients request a Savings Card.*

71.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. The screenshot shows that the Google Tracking Tools on the Tafinlar + Mekinist Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the

user's Google account, as well as information commonly used to make a browser fingerprint, including the user's device information and language.

***Xolair Website***

72.    The following screenshots ("Figures 13-14") depict network transmissions made to Google by the Tracking Tools installed on the Xolair Website. As Figures 13-14 show, when patients request a Savings Card through the Xolair Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Xolair Website includes the fact that the patient is prescribed Xolair and the fact that the patient requested a Xolair Savings Card.

/

/

/

/

/

/

/

/

/

/

/

/

/

/

36

| Key | Value |
|---|---|
| v | 2 |
| tid | G-Z1JYQ02SB0 |
| gtm | 45je5990v9132988537za200zd9132988537 |
| _p | 1757534459168 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1819855897.1757534371 |
| ul | en-us |
| sr | 2560x1440 |
| ir | 1 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| uaa | x86 |
| uab | 64 |
| uafvl | Chromium;140.0.7339.81|Not%3DA%3FBrand;24.0.0.0|Microsoft%20Edge;140.0.3485.54 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| _prs | gs |
| _eu | AAgAAAQ |
| _s | 3 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528500~104684208~104684211~104948813~105367987~105367989~105426769~105426771 |
| sid | 1757534370 |
| sct | 1 |
| seg | 1 |
| dl | https://www.xolair.com/crswnp/financial-support/apply.html |
| dr | https://www.xolair.com/crswnp.html |
| dt | Apply for Financial Support | XOLAIR® (omalizumab) |
| _tu | QA |
| en | body_content_link_click |
| _c | 1 |
| ep.content_destination_title | Get started |
| ep.content_destination_url | https://www.xolair.com/crswnp/financial-support/tool.html |
| ep.content_type | external |
| ep.component_type | link |
| ep.content_location | body |
| ep.full_url | https://www.xolair.com/crswnp/financial-support/apply.html |
| ep.is_va | False |
| ep.va_mcm_id | |
| ep.va_name | |
| ep.va_type | |
| ep.aem_adl | xolair:crswnp:patient:link:apply:lnk-1fba6f9277:click:1 |
| _et | 2 |
| tfd | 13692 |



*Figures 13-14. Exemplar screenshots depicting network traffic from the Xolair Website which shows information transmitted to Google when patients request a Savings Card.*

73.     Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Class Members to their identities. The screenshots show that the Google Tracking Tools on the Xolair Website transmitted the identifier numbers attached to Google's 'cid' and 'sid' cookies, which identify the user's

Google account, as well as information commonly used to make a browser fingerprint, including the user's device information and language.

74.    In their default state, the Tracking Tools record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage. Here, Defendant purposely configured the Tracking Tools on the Pharmaceutical Websites to collect and transmit additional user data, including the specific actions that Plaintiff and Class Members' took while applying for Savings Cards, their medical diagnoses, and their prescription statuses.

**B. DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT**

**i.    Defendant failed to inform Plaintiff and Class Members of its disclosure of Plaintiff's and Class Members' Sensitive Health Information.**

75.    Defendant *never* informed Plaintiff or Class Members that it was sharing their personally identifiable Sensitive Health Information with third parties, including the Tracking Tool Providers

76.    By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

77.    Despite never telling users like Plaintiff and Class Members, Defendant allowed third parties such as the Tracking Tool Providers to intercept Plaintiff's and Class Members' Sensitive Health Information and use it for advertising purposes.

/

/

/

39

ii. **The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members**

78.     The Tracking Tools installed on the Pharmaceutical Websites were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Pharmaceutical Websites through examination of its source code or the use of sophisticated web developer tools, there was no way for a Pharmaceutical Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiff and Class Members, were unable to detect the Tracking Tools on the Pharmaceutical Websites.

79.     Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

80.     Plaintiff and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

81.     Because Plaintiff and Class Members were not aware of the Tracking Tools on the Pharmaceutical Websites, or that their Sensitive Health Information would be collected and transmitted to the Tracking Tool Providers, they could not and did not consent to Defendant's conduct.

C. **DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES**

i. **Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Health Information.**

82.     As explained, *supra*, users of the Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing the Tracking Tool Providers' Tracking Tools on their website.

40

83.     Upon information and belief, Defendant, as a user of the Tracking Tool Providers' Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing the Tracking Tool Providers' to collect Plaintiff's and Class Members' Sensitive Health Information.

### ii.     Plaintiff's and Class Members' Data Had Financial Value

84.     Moreover, Plaintiff's and Class Members' Sensitive Health Information has value and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiff and the Class.

85.     According to Facebook's annual report, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[44]

86.     Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

87.     Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[45] In fact, compared to other types of personal data, healthcare data records are by far

---

[44] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 7, 2025).

[45] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[46]

88.     Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

89.     The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiff and Class Members.

## D.  DEFENDANT's USE OF THE TRACKING TOOLS VIOLATES HIPAA

### i.     The HIPAA Privacy Rule

90.     The disclosure of Plaintiff's and Class Members' Private Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[47]

91.     The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by covered entities.

92.     These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google or Facebook account) to identify a

---

[46] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

[47] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html  (last visited Mar. 7, 2025).

single individual.[48]

### ii. Defendant's Collected IIHI from Plaintiff and Class Members and Transmitted it to Unauthorized Third Parties

93. The Sensitive Health Information that Defendant disclosed to unauthorized third-parties through the Tracking Tools—including the drugs Plaintiff and Class Members are prescribed, the means by which they pay for these prescriptions, their specific medical conditions, and their patient statuses—is undoubtedly IIHI.

94. Under HIPAA, IIHI is any information that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103. Plaintiff's and Class Members' Sensitive Health Information, which includes both their specific medical conditions and specific prescription drugs taken to treat those medical conditions, is squarely within the ambit of this definition.

95. Moreover, the Department of Health and Human Services ("HHS") has explicitly advised that "a pharmaceutical manufacturer that provides support and guidance to doctors and

---

[48]   *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Oct. 8, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

patients regarding the proper use of their products is providing 'health care'" under the meaning of HIPAA and is thus a covered entity.[49]

96.    Defendant provided health care to Plaintiff and Class Members in connection with the Pharmaceutical Websites. For example, through the Pharmaceutical Websites, Defendant:

    a.    Provided Plaintiff and Class Members with detailed information on how to properly administer and calculate the dosages of Plaintiff's and Class Members prescription drugs;

    b.    Granted Plaintiff and Class Members with access to "Novartis Patient Support," which provides financial assistance, insurance support, and resources related to their treatment;

    c.    Made Novartis Patient Support team available to Plaintiff and Class Members as to serve as resources for Plaintiff and Class Members with regards to their prescriptions;

    d.    Repeatedly and ubiquitously referred to Plaintiff and Class Members as their "patients"; and

    e.    Collected and stored medical information from Plaintiff and Class Members, including the drugs that Plaintiff's and Class Members' are prescribed, the type of health insurance that Plaintiff's and Class Members' hold, and the medical conditions that Plaintiff's and Class Members' have been diagnosed with, and additionally required Plaintiff and Class Members to affirm that this information was accurate and identical to information provided to their treating physicians and health insurance providers.

### iii.    Defendant's Use of the Tracking Tools Violates HIPAA

97.    While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

98.    Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant

---

[49] *Response to Comments Received – General Provisions: Definitions - Covered Entity*, 65 FR 82569 (2000).

are ***not*** permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent.

99. Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA* Covered *Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[50]

100. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[51]

101. Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

102. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

103. Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably

---

[50] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* HHS, *available                                online                                at*: https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html.

[51] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

104.    The HIPAA Privacy Rule requires any "covered entity" to maintain appropriate safeguards to protect the privacy of protected health information, and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

105.    Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be Protected Health Information. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it is part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[52]

106.    Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written

---

[52]    *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html    (last visited Mar. 7, 2025).

authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[53]

107.    Here, Defendant provided patient information to third parties in violation of the Privacy Rule.

108.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

109.    Defendant further failed to comply with other HIPAA safeguard regulations as follows:

    a.  Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

    b.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

    c.  Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. § 164.308(a)(6)(ii);

    d.  Failing to protect against reasonably anticipated threats or hazards to

---

[53]    *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html  (last visited Mar. 7, 2025).

the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e.   Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f.   Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g.   Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

## E.  PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

110.   At all times when Plaintiff and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose, unrelated to providing them with medical care.

111.   Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

112.   For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[54]

---

[54] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Mar. 7, 2025).

48

113. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[55] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[56]

114. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiff and Class Members.

## V. TOLLING AND ESTOPPEL

115. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of the Tracking Tools onto the Pharmaceutical Websites.

116. The Tracking Tools on the Pharmaceutical Websites were and are invisible to the average website visitor.

117. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

118. Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on their part.

119. Defendant had exclusive knowledge that the Pharmaceutical Websites incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiff and Class Members, that by accessing information and/or applying for Savings Cards through the

---

[55] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[56] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

Pharmaceutical Websites, Plaintiff's and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including the Tracking Tool Providers.

120. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of their patients' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to their patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

121. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

122. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI.   CLASS ALLEGATIONS

123. This action is brought by the named Plaintiff on her behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

124. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**The Nationwide Class**

All natural persons who used a Pharmaceutical Website to apply for a Savings Card, create an account and/or apply to a pharmaceutical support program, and whose Sensitive Health Information was disclosed or transmitted to one of the Tracking Tool Providers, or any other unauthorized third party.

125. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of a separate Vermont Subclass, which is defined as follows:

**Vermont Subclass**

All natural persons residing in the State of Vermont who used a Pharmaceutical Website to apply for a Savings Card, create an account and/or apply to a pharmaceutical support program, and whose Sensitive Health Information was disclosed or transmitted to one of the Tracking Tool Providers, or any other unauthorized third party.

126. Excluded from the proposed Class (including the subclass) are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendant and its parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

127. Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

128. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. On information and belief, there are at least 100,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

129. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

  a.    Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiff and Class Members;

  b.    Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiff and Class Members to unauthorized third parties;

51

c.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

d.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Health Information was being disclosed without their consent;

e.  Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

f.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g.  Whether Defendant violated the statutes asserted as claims in this Complaint;

h.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i.  Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

130.  **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools. Plaintiff is typical of, and represents, a subclass of Pharmaceutical Website users residing in her home state whose Sensitive Health Information was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

131.  **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be

52

antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

132.   **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including the Tracking Tool Providers, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

133.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

134.   Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

53

135.   Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c) Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

136.   Finally, all members of the proposed Class are readily ascertainable. Defendant and the Tracking Tool Providers have access to Class Members' names and other identifying information provided to Defendant through the Pharmaceutical Websites.

### COUNT I
### COMMON LAW INVASION OF PRIVACY
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Vermont Subclass)*

137.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

138.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

139.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Pharmaceutical Websites and the communications platforms and services therein.

140.    Plaintiff and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

141.    Defendant's interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

142.    Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

143.    Defendant's disclosure and publicization of Plaintiff's and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

144.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

55

145.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

146.    Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

147.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

148.    Plaintiff also seeks such other relief as the Court may deem just and proper.

## COUNT II
## BREACH OF CONFIDENCE
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Vermont Subclass)*

149.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

150.    Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential.

151.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on the Pharmaceutical Websites.

152.    Contrary to its duties as medical providers and its express promises of confidentiality, Defendant deployed the Tracking Technologies to disclose and transmit Plaintiff's and Class Members' Sensitive Health Information and the contents of their communications exchanged with Defendant to third parties, including the Tracking Tool Providers.

56

153. Defendant's disclosures of Plaintiff's and Class Members' Sensitive Health Information were made without their knowledge, consent or authorization, and were unprivileged.

154. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

155. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

    a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

    b. Defendant eroded the essential confidential nature of the provider-patient relationship;

    c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensating Plaintiff and Class Members for the data;

    d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

    e. Defendant's actions diminished the value of Plaintiff's and Class Members' Sensitive Health Information, and

    f. Defendant's actions violated the property rights Plaintiff and Class Members have in their Sensitive Health Information.

156. Plaintiff and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiff is also entitled to punitive damages.

/

/

/

57

## COUNT III
## BREACH OF FIDUCIARY DUTY
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Vermont Subclass)*

157.   Plaintiff repeats and realleges allegations contained in paragraphs 1 through 156 as if fully set forth herein.

158.   Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential, which creates a special relationship between Defendant and Plaintiff.

159.   In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardians of Plaintiff's and Class Members' Sensitive Health Information, Defendant became fiduciaries by their undertaking and guardianship of the Sensitive Health Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Sensitive Health Information; (2) to timely notify Plaintiff and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and do store.

160.   Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with their patients and former patients, in particular, to keep secure their Sensitive Health Information private.

161.   Defendant breached its fiduciary duties to Plaintiff and Class Members by disclosing their Sensitive Health Information to unauthorized third parties, and separately, by failing to notify Plaintiff and Class Members of this fact.

162.   As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be

proven at trial.

## COUNT IV
## NEGLIGENCE
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Vermont Subclass)*

163. Plaintiff repeats and realleges the allegations contained in in paragraphs 1 through 162 as if fully set forth herein.

164. Through their use of the Pharmaceutical Websites, Plaintiff and Class Members provided Defendant with their Sensitive Health Information, believing such Information would be kept confidential.

165. By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

166. Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to the Tracking Tool Providers.

167. Defendant further negligently omitted to inform Plaintiff and the Class that they would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

168. Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

169. Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

170. Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive

damages.

171. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; and (ii) submit to future annual audits of those systems and monitoring procedures.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Vermont Subclass)***

172. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 171 as if fully set forth herein.

173. When Plaintiff and Class Members provided their Sensitive Health Information to Defendant in exchange for medical services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose the Sensitive Health Information without consent.

174. Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Health Information to Defendant.

175. Plaintiff and Class Members would not have entrusted Defendant with their Sensitive Health Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Health Information without consent.

176. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Health Information to third parties like the Tracking Tool Providers.

177. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

178.  Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

179.  Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

**COUNT VI**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Vermont Subclass)***

180.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 179 as if fully set forth herein.

181.  Plaintiff pleads this claim in the alternative to her breach of implied contract claim.

182.  Plaintiff and Class Member conferred a monetary benefit on Defendant in exchange for healthcare services. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

183.  Defendant knew that Plaintiff and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

184.  In particular, Defendant enriched themselves by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Health Information.

185.  Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its patients' Sensitive Health Information.

186.    Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Health Information.

187.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

188.    Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of direct money damages.

189.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

190.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## COUNT VII
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"),
18 U.S.C. § 2511(1), *et seq*.
Unauthorized Interception, Use, and Disclosure
*(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Vermont Subclass)***

191.    Plaintiff repeats and realleges the allegations contained in the paragraphs 1 through 190 as if fully set forth herein.

192.    The ECPA protects both sending and receipt of communications.

193.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

194. The transmissions of Plaintiff's Sensitive Health Information to the Pharmaceutical Websites qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

195. Electronic Communications. The transmission of Sensitive Health Information between Plaintiff and Class Members and the Pharmaceutical Websites with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

196. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

197. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

198. Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.    Plaintiff's and Class Members' browsers;

    b.    Plaintiff's and Class Members' computing devices;

    c.    Defendant's web-servers; and

    d.    The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

199.     By utilizing and embedding the Pixels on the Pharmaceutical Websites, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

200.     Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to third parties such as the Tracking Tool Providers.

201.     Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including their prescription statuses and medical conditions.

202.     By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

203.     By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

204.     <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

205.    The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

206.    Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class.  However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exemption.

207.    Defendant's acquisition of sensitive communications that were used and disclosed to the Tracking Tool Providers was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

    a.  Invasion of privacy;

    b.  Breach of confidence;

    c.  Breach of fiduciary duty;

    d.  Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3); and

208.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Health Information on the Pharmaceutical Websites, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Private Information with the Tracking Tool Providers and other third-parties that (a) did not participate in these communications, (b) Plaintiff and Class Members did not know were receiving their Sensitive Health Information, and (c) Plaintiff and Class Members did not consent to receive their Sensitive Health Information.

209.    As such, Defendant cannot viably claim any exception to ECPA liability.

210.    Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b.    Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

c.    Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Pharmaceutical Websites and determining what ads people see on the Pharmaceutical Websites, without providing any value or benefit to Plaintiff or Class Members;

d.    Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e.    The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiff and Class Members intended to remain private, no longer private.

211.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Health Information for financial gain.

212.    Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

213.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

214.    Any purported consent that Defendant may claim to have received from Plaintiff and Class Members was not valid.

66

215. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Pharmaceutical Websites, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

216. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and other Class Members, pray for judgment against Defendant as follows:

A. an Order certifying the Nationwide Class, and Vermont Subclass, and appointing the Plaintiff and her Counsel to represent the Classes;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiff and Class Members;

C. injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded and

G. all such other and further relief as this Court may deem just and proper.

/

/

Dated: March 20, 2026

Respectfully submitted,

*/s/ Alyssa Tolentino*
Alyssa Tolentino (Bar No. 569432025)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (212) 532-1091
E: atolention@sirillp.com

Jordan Underhill*
**SIRI & GLIMSTAD LLP**
1005 Congress Avenue, Suite 925-C36
Austin, TX 78701
Tel: (212) 532-1091
E: junderhill@sirillp.com

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
400 East Pratt Street, 8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

*pro hac vice admission anticipated*

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.

Dated: March 20, 2026                                    Respectfully submitted,

                                                         */s/ Alyssa Tolentino*
                                                         Alyssa Tolentino